```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF TENNESSEE

 3                         AT CHATTANOOGA
       ------------------------------------------------------------
 4                                    :
       UNITED STATES OF AMERICA,      :
 5                                    :
               Plaintiff,            :
 6                                    :
       v.                             :          1:14-CR-109
 7                                    :
       BRIAN LEE KRZECZOWSKI,         :
 8                                    :
               Defendant.            :
 9     ------------------------------------------------------------
                                          Chattanooga, Tennessee
10                                        October 15, 2014

11

12          BEFORE:  THE HONORABLE BILL CARTER,
                     UNITED STATES MAGISTRATE JUDGE
13

14     APPEARANCES:

15

               FOR THE PLAINTIFF:
16
               TERRA BAY
17             Assistant United States Attorney
               1110 Market Street, Suite 515
18             Chattanooga, Tennessee  37402

19

               FOR THE DEFENDANT:
20
               PAUL BERGMANN, III
21             Law Office of Paul Bergmann, III
               707 Georgia Avenue, Suite 203
22             Chattanooga, Tennessee  37402

23

24                   ARRAIGNMENT/DETENTION HEARING

25
```

1          THE CLERK:  Criminal Action 1:14-CR-109, United

2    States of America versus Brian Lee Krzeczowski.

3          THE COURT:  Counsel, please make appearances for the

4    record, the government first.

5          MS. BAY:  Terra Bay for the United States.

6          MR. BERGMANN:  Paul Bergmann for Mr. Krzeczowski,

7    Your Honor.

8          THE COURT:  Thank you.

9          We're here this morning for an arraignment and

10   detention hearing.  The case came on initially for an initial

11   appearance, and I believe that that's what happened, and we

12   did not get to the arraignment or -- or that.  I think that

13   happened Friday.  Was that not --

14         MS. BAY:  That's correct, Your Honor.

15         MR. BERGMANN:  That's correct.

16         THE COURT:  All right.  I'm going to need to ask

17   Mr. Krzeczowski a few limited questions.

18         The same questions I asked before, Mr. Krzeczowski,

19   your name, age, education, and whether you understand what's

20   going on around you today.  That will have to happen

21   preliminarily.  You do have a right guaranteed by the

22   Fifth Amendment to remain silent, not to incriminate yourself.

23   But usually people can answer those limited questions.

24         You will be under oath, subject to penalties of

25   perjury.  And if you were to make admissions about the facts

1  of the case, they could be used against you.  And I remind you

2  again you want to avoid doing that.

3            I do need to have you sworn in.  So if you would

4  just stand and remain standing there, my deputy clerk will

5  swear you in.

6            (The defendant was duly sworn.)

7            THE COURT:  What's your full name, Mr. Krzeczowski?

8            THE DEFENDANT:  Brian Lee Krzeczowski.

9            THE COURT:  And how old are you, sir?

10           THE DEFENDANT:  Forty-one.

11           THE COURT:  And how much education do you have?

12           THE DEFENDANT:  I've got a GED.

13           THE COURT:  You have a GED.  All right, sir.  Do you

14  feel like you generally understand what's going on around you

15  today?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  All right.  Mr. Bergmann, have you had an

18  opportunity to review the indictment with Mr. Krzeczowski?

19           MR. BERGMANN:  I have, Your Honor.

20           THE COURT:  Is it going to be appropriate--  We

21  summarized it at the initial hearing.  Is it going to be

22  appropriate for him to waive reading of it and enter a not

23  guilty plea to each of the counts?

24           MR. BERGMANN:  Yes, Your Honor.  Yes, Your Honor.

25           THE COURT:  Is that what you want to do,

```
 1    Mr. Krzeczowski, not to require it to be read, but to enter a

 2    not guilty plea to each of the four counts?

 3              THE DEFENDANT:  Yes, sir.

 4              THE COURT:  All right.  The Court will enter, then,

 5    the not guilty pleas to each count of the indictment.

 6              Now, with regard to detention or release, the Court

 7    has received a report.  The report seems to indicate that at

 8    some point there might be a recommendation of release, but

 9    that certain things have not happened, a home investigation,

10    that sort of thing.

11              What is the government's position with regard to

12    detention in this case, in light of the -- that situation?

13              MS. BAY:  Your Honor, first, all four of the charges

14    bring the rebuttable presumption.  We are seeking detention.

15    And we are prepared to put on a witness who we expect will give

16    more information than's in the report about the defendant's

17    conduct.  And we expect that the probation department will

18    change their recommendation after hearing this additional

19    evidence.

20              THE COURT:  All right.  Well, of course the -- even

21    if the probation department does change their recommendation,

22    and even though there is a rebuttable presumption, the Court

23    would give Mr. Krzeczowski a hearing.

24              Mr. Bergmann, are you ready to proceed today?

25              MR. BERGMANN:  Your Honor, we will waive the hearing
```

1   for today.  We would like that home evaluation to be done.  We
2   don't know whether-- And I'm privy to the information that --
3   about which the U. S. Attorney is speaking.  But we will waive
4   the hearing today.  We would like for the home evaluation to be
5   done.  The family is here.  They're willing to take him home.
6   They're willing to comply with all of the conditions that are
7   set forth in this report.  But we would like that home
8   evaluation.  We think it would bolster his chances to get out.
9   And I think it's going to be a short hearing before that
10  detention -- I'm sorry, before that investigation can be
11  conducted, but we would like to do that.  I can file a motion
12  for release, pretrial release, after that report.  And I can
13  also talk to Ms. Lindsey, who is the probation officer.

14          THE COURT:  What's the government's position on that?

15          MS. BAY:  Well, I think that in my speaking with
16  Ms. Lindsey and Mr. Bergmann, Ms. Lindsey indicated she spoke
17  with the defendant's family, they have told her that they would
18  do a certain number of things, which I think are already in the
19  pretrial release report, and she believes that they would do
20  those things.  So I don't know that Ms. Lindsey would find
21  additional information --

22          THE COURT:  Well, I suspect that they would, too.  I
23  don't think that-- You know, they're here for him.  They're
24  not going to-- If the report indicates they're relatively
25  minor things that need to be done, and I just would say that I

1  will assume that they will be done, but I don't see any reason

2  not to hear whatever evidence there is, because I have to make

3  a determination.  I mean, I can assume that that's going to

4  happen.  They're all here, and I believe that they -- I believe

5  that they will do what she is requiring, from what's in this

6  report.

7              MS. BAY:  I think that's a safe assumption, Your

8  Honor.  That's why we think we should go ahead and have the

9  hearing today, if the defendant is still seeking release,

10  because I don't believe that the home study would change

11  anything from where it is right now.

12              THE COURT:  Well, I don't -- I don't know what it is

13  that I'm about ready to hear, but I would want to know what the

14  recommendation of Pretrial is, obviously.  But I would want to

15  hear whatever evidence that I need to hear.

16              There is a rebuttable presumption, Mr. Krzeczowski,

17  based upon the nature of these charges, that you are a risk of

18  flight and a danger to the community.  So that's the -- where

19  it starts.  And I'm--  Unless there is a problem with

20  proceeding today on the hearing, these witnesses are here——I

21  think they've probably been here on two occasions——I would

22  prefer to go ahead and have the hearing.

23              MR. BERGMANN:  At your pleasure, Your Honor.  We can

24  do that.

25              THE COURT:  That's all right?

```
 1                MR. BERGMANN:  Yes, sir.

 2                THE COURT:  Okay?  Well, let's just do that.  Then

 3    Ms. Lindsey can take care of the situation with regard to the

 4    needed investigation if that's deemed appropriate.  So I'll

 5    allow the government to proceed, then.

 6                MS. BAY:  We would call Special Agent Scott Barker.

 7                THE COURT:  All right.

 8                (The witness was duly sworn.)

 9                THE COURT:  Just one moment.

10                (Brief pause.)

11                THE COURT:  All right.  You may proceed.

12                             SCOTT BARKER,

13    called as a witness at the instance of the government,

14    having been first duly sworn, was examined, and testified as

15    follows:

16                           DIRECT EXAMINATION

17    BY MS. BAY:

18    Q        Will you state your name for the record, please?

19    A        Scott Barker, B-A-R-K-E-R.

20    Q        Where do you work?

21    A        I'm a special agent with the FBI, assigned to the

22    Chattanooga office.

23    Q        How long have you been a special agent?

24    A        It will be 25 years in January.

25    Q        What type of cases do you investigate?
```

1   A         Various criminal investigations, white-collar,

2   crimes against children, pretty much whatever comes in the

3   door, really.

4   Q         And regarding crimes against children, have you

5   received any special training?

6   A         I have.

7   Q         What type of training?

8   A         I have gone to several in-services concerning

9   violations or crimes against children, investigating those

10  crimes against children cases, how to review computer forensic

11  examinations, things of that nature.

12  Q         And about how many crimes against children

13  investigations have you participated in?

14  A         It's over a hundred.  I don't know the exact number.

15  Q         Are you familiar with the investigation that led to

16  the arrest of Brian Krzeczowski?

17  A         I am.

18  Q         And could you tell us how that investigation began?

19  A         The investigation was initiated by the Gallatin

20  Police Department after a complaint was received by them.

21  This would have been approximately December of 2013.

22            They received a complaint from a young lady who said

23  that she had had been involved in an online relationship with

24  an individual by the name of Brian Thomas; during the course

25  of that online relationship, they began exchanging

1   photographs; during that time period, the photographs became

2   pornographic in nature; she sent him numerous pornographic

3   photographs of herself, and at the time she was under the age

4   of 18; the relationship ended, and then, like I say, in

5   December of '13 she received a e-mail from him, and then some

6   photographs of herself were actually posted on her Facebook

7   page, they were pornographic, they were pornographic

8   photographs of herself sent back to her e-mail.  And then at

9   that point she filed a complaint with the Gallatin Police

10  Department.  They init- --

11  Q       Did --

12  A       I'm sorry.

13  Q       You said she received an e-mail before these images

14  were posted?

15  A       The e-mail -- yes, the e-mail contained -- the

16  e-mail that she had received contained some of the

17  pornographic photographs of herself.  And when she filed the

18  complaint, the Gallatin Police Department initiated an

19  investigation, they began researching the e-mail addresses,

20  the IP addresses, a telephone number that she had been

21  communicating with with the gentleman.  And the information

22  came back to the defendant.  At that point they contacted the

23  Rhea County Sheriff's --

24          THE COURT:  Just one moment.

25          THE WITNESS:  I'm sorry.

October 15, 2014      Barker - Direction Examination

```
 1              THE COURT:  I'm making sure I'm not lost.

 2              THE WITNESS:  Okay.

 3              THE COURT:  She had a relationship online --

 4              THE WITNESS:  Online.

 5              THE COURT:  -- with a man that she said was named

 6     Brian Thomas?

 7              THE WITNESS:  Thomas, yes.

 8              THE COURT:  And then the IP address from the e-mails

 9     came back to --

10              THE WITNESS:  The residence --

11              THE COURT:  -- this defendant?

12              THE WITNESS:  The residence where he lives, yes.

13              THE COURT:  All right.  Came back to his residence.

14              THE WITNESS:  Yes.

15              THE COURT:  All right.

16              THE WITNESS:  At that point they obtained a search

17     warrant, searched the premises, seized computers and hundreds

18     of CDs or DVDs from the defendant's residence.

19     BY MS. BAY:

20     Q        Let me ask you one question.  While the

21     investigation was attempting to determine who was -- who this

22     individual was, was there an e-mail address associated with

23     this --

24     A        Yes.

25     Q        -- offense?
```

October 15, 2014      Barker - Direction Examination

1   A         Yes.

2   Q         What is that e-mail address?

3   A         Tennesseetrouble2@gmail.com.

4   Q         And was there anything regarding Social Security

5   numbers that -- that would lead you to believe that this

6   defendant is the person who was communicating with the minor?

7   A         There was a conversation -- as I recall, there was a

8   conversation between the defendant and the young lady in which

9   they talked about -- he made mention that their last four

10  digits of their Social Security number were the name, the last

11  four digits.  And I don't recall what those four numbers were,

12  but the last four digits of his Social Security number were

13  the four digits that they were talking about.

14  Q         Of his --

15  A         Of his --

16  Q         This defendant's?

17  A         Yes.

18  Q         Okay.

19            THE COURT:  So the conversation was that her last

20  four digits of her Social Security were the same as the last

21  four digits of his?

22            THE WITNESS:  Yes, sir.  As I recall, yes.

23            THE COURT:  Okay.

24  BY MS. BAY:

25  Q         And they matched the last four of this defendant?

1    A         That's correct.

2    Q         And so you were talking about the computers and DVDs

3    or CDs?

4    A         Yes, ma'am.

5    Q         I think you said hundreds --

6    A         Hundreds.

7    Q         -- of DVDs or CDs?

8    A         Yes, ma'am.

9    Q         What else occurred?

10   A         At that point we were contacted by -- not only

11   Gallatin Police Department but Rhea County Sheriff's Office

12   contacted us to assist with the investigation.  At that point

13   we conducted a forensic examination on the computer and

14   forwarded those results of our examination to the National

15   Center for Missing and Exploited Children, where they came

16   back with a report stating the number of images that appeared

17   to be child -- or that were child pornographic of known --

18   what we call known victims.  And then of course we reviewed

19   the CDs as well.

20   Q         So the --

21             THE COURT:  Let me stop you.  These are familiar --

22   more familiar to you than they are to me.

23             THE WITNESS:  I'm sorry.

24             THE COURT:  This report went to whom?

25             THE WITNESS:  National Center for Missing and

1   Exploited Children, or NCMEC, as we call it.

2             THE COURT:  Well, let's not do that.  National Center

3   for Missing or Exploited Children.

4             THE WITNESS:  Yes, sir.

5             THE COURT:  All right.  Now, what was sent to them?

6             THE WITNESS:  When we conducted the forensic

7   examination on the computer, we send the results to them.  What

8   they do is, they compare the images with a database that they

9   have compiled that lists what we call known victims; in other

10  words, those children have been identified as being -- all

11  being under the age of 18, and we know who those children are.

12  So we compare the images that we receive off of the examination

13  with those, and then they send us back a report stating,

14  "Here's the number of images of what we call known victims,

15  whether it be images and/or videos," and they put that in a

16  report to us.  They also -- what they also do is, then they

17  notify the victims themselves that their images have appeared

18  again in an investigation either conducted by state, locals, or

19  us.

20            THE COURT:  All right.

21  BY MS. BAY:

22  Q       So, to be clear, was -- were any of the -- any of

23  CDs or the computers in the defendant's house contain images

24  of child pornography?

25  A       They did.

October 15, 2014        Barker – Direction Examination

1  Q        And was this a handful?  Was it more than a hundred?

2  A        There were more than 200 images that were of known

3  victims, and I think there were three videos of known victims,

4  that came back in the report.

5  Q        And were any images of this minor who began the

6  investigation found in the defendant's computer or CDs?

7  A        Yes.

8  Q        Also, did you or another agent have an opportunity

9  to interview the defendant?

10  A        The defendant-- The defendant--  I did not.

11  Someone else interviewed the defendant.

12  Q        Are you familiar with that interview?

13  A        Yes, somewhat, yes.

14  Q        And did the defendant admit to possessing the child

15  pornography?

16  A        Yes.

17  Q        Did he admit to having an online relationship with

18  this -- with this individual?

19  A        Yes.

20  Q        Now, because we are -- this is a detention hearing,

21  did that information lead to an indictment charging the

22  defendant with four counts related to child pornography?

23  A        Yes, ma'am.

24  Q        On the detention hearing side of this, then, I would

25  ask, do you have any information that would be helpful to the

1    Court in determining if the defendant is a danger to the

2    community?

3    A          After -- after the search warrant was executed by

4    Gallatin Police Department and Rhea County Sheriff's Office,

5    and that would have been approximately January -- I think it

6    was January of 2014, there was a complaint filed with --

7    again, with the National Center for Missing and Exploited

8    Children.  They have a cyber tip hotline.  There was a

9    complaint filed by an individual who said that someone using

10   the e-mail address of tennesseetrouble2@gmail.com was online

11   saying that they were an 18-year-old girl who was having sex

12   with her younger brother and could provide photographs of that

13   situation.

14          THE COURT:  All right.  So that is the defendant's

15   e-mail, correct?

16          THE WITNESS:  Yes.

17          THE COURT:  Someone was on that address saying that

18   they were --

19          THE WITNESS:  An 18-year-old girl.

20          THE COURT:  And what were they asking for?

21          THE WITNESS:  They were saying that they were having

22   an online relationship with a -- with their younger brother

23   and -- or a relationship with their younger brother, and that

24   they could provide photographs of that, and that they

25   were having sex -- that she, she, was having sex with her

1  younger brother, was the complaint that was received.  As a

2  result of that, there was also an IP address that was

3  associated with that.  That came back to Charter

4  Communications.  We served a subpoena on Charter

5  Communications, and the IP address came back to the residence

6  where Mr. -- where the defendant was living.

7  BY MS. BAY:

8  Q        Now, in your investigations an individual who claims

9  to have photographs, themselves, that are of child

10 pornography, what does that indicate to you?

11 A        It's been my experience if they're saying that they

12 have the photographs, then they have the photographs, because

13 in dealing with individuals who trade child pornography,

14 they're out there trading, they're not going to go out there

15 and say, "I have --" I've never come across an individual who

16 says, "I have child pornography," and not been able to produce

17 that child pornography to somebody that wants it.  And that's

18 really how we receive most of our complaints, where someone

19 says, "I have pictures of child pornography," they produce --

20 or they send those child pornography images, and then that's

21 -- a lot of times that's how we become involved in the

22 investigation.  So --

23 Q        So is that --

24 A        I'm sorry.

25 Q        Go ahead.

```
 1  A          So, in my experience, if a person says they have

 2  those images, chances are they have those images.

 3  Q          And is that your experience that it's an offer to

 4  trade images?

 5  A          That's exactly what it is a lot of times, yes,

 6  ma'am.

 7  Q          Now, in addition to that, has anything else come to

 8  your attention regarding this defendant and child pornography?

 9  A          Just last month, in September of 2014, the National

10  Center for Missing and Exploited Children received another

11  cyber tip where an individual claiming to be -- again,

12  claiming to be a female, a teacher, said in conversations with

13  someone online saying that they were a teacher and that they

14  were having sex with their students.  They actually -- this

15  person actually sent a photograph to an individual that they

16  were chatting with, and the person came back and said, "That's

17  too young.  I don't want anybody that's under the age of 18.

18  Don't send me that again."

19          The person went on to say that he had been having

20  sex with these children by tutoring them after school, and

21  that they -- that was something that they wanted to do, and

22  that they were willing participants.  The IP address also came

23  back to Charter Communications.  A subpoena served on Charter

24  Communications by the Dayton Police Department in this

25  instance, the IP address also came back to the residence where
```

1   the defendant lived.

2   Q        So the IP address that was tied to the defendant's

3   residence, was that the address that said -- the person saying

4   that they were a teacher having sex with their children, or

5   was that the other side of the conversation?

6   A        That was -- the person said they were a teacher,

7   they said they were from Tennessee.  I don't remember exactly

8   what town they said they were from, but they said they were

9   from -- it wasn't Dayton, I do remember that, but they just

10  said they were a teacher from Tennessee and that they -- they

11  were having sex with their students.

12  Q        Okay.  I'm guessing --

13           THE COURT:  These events happened after a search

14  warrant was served on him?

15           THE WITNESS:  Yes, sir, that's correct.

16           THE COURT:  And he was obviously aware the search

17  warrant had been served, because they executed it on him?

18           THE WITNESS:  He was there, yes, sir.  And so that IP

19  address -- when -- the IP address of the two individuals

20  chatting, the one who claimed to be the teacher, the IP address

21  was Charter Communication.  The IP address actually comes back

22  in the name of Jerry Cheeks at 252 Cheeks Lane, I think, and

23  it's in Dayton, Tennessee, which is where the defendant lives.

24  Q        Is that -- is his address 252 Cheeks?

25  A        Yes.

Case 1:14-cr-00109-TRM-CHS  Document 36  Filed 08/05/15  Page 18 of 44  PageID #: 281

1                THE COURT:  It comes back as Jerry --

2                THE WITNESS:  That's--  I believe that's his

3       stepfather.

4                THE COURT:  Jerry Cheeks?

5                THE WITNESS:  Cheeks on Cheeks Lane.

6                THE COURT:  Spell the last name.

7                THE WITNESS:  C- -- I think it's C-H-E-E-K-S.

8                THE COURT:  All right.  So Jerry Cheeks on Cheeks

9       Lane?

10                THE WITNESS:  Yes, sir.

11                THE COURT:  All right.

12      BY MS. BAY:

13      Q         Actually 252 Cheeks Lane.

14      A         252, that's correct.

15      Q         Which is the house number of the defendant as well?

16      A         Yes, that's correct.

17      Q         Aside from those things, is there anything else

18      related to child pornography and this defendant?

19      A         There's -- right now -- after the forensic

20      examination was conducted on the computer, there were -- and I

21      don't remember the exact number -- it was over a hundred

22      images of what -- of a girl, one girl, some of the images were

23      not pornographic, other images were pornographic.  Based on --

24      we were able to -- from those photographs being sent, we were

25      able to come up with some GPS coordinates of where those --

1    possibility of where those photographs were taken.  The

2    photographs -- or the GPS coordinates came back to a town in

3    Kansas.  I think it's Atkinson, Kansas.  In looking at the GPS

4    coordinates on a map, we were able to determine that the

5    coordinates were very close to the high school there in this

6    particular town in Kansas.

7              At that point I requested the agents -- I sent the

8    photographs to the agents in Kansas City and asked them if

9    they could follow up on these GPS coordinates in an attempt to

10   identify this girl.  They showed the photographs to a school

11   resource officer there at this particular high school that's

12   near these GPS coordinates, and the officer said that he was

13   able to identify the girl, said he knew the girl, and said

14   that at that time she was 17 years of age.  They are in the

15   process of setting up a forensic interview to interview this

16   girl as we speak.  In fact, I think it's actually supposed to

17   happen this week, where they're going to interview this girl

18   concerning these photographs and the relationship she had

19   online with tennesseetrouble2.

20   Q        And this is separate from the known victims that the

21   National Center for Missing and Exploited Children already

22   have, these --

23   A        Correct.

24   Q        -- this set of pictures of this girl?

25   A        That's correct.  And to go a little bit further,

1  there were files set up -- when we did the forensic inter- --
2  or the forensic examination, there were files set up with
3  individual girls in these files, with names, dates of births.
4  So we're in the process of trying to identify those girls as
5  we speak and see if we can locate those girls as well, because
6  based on what we see, it appears that these are
7  photographs that were taken and sent to the defendant, or at
8  least they were on the defendant's computer.  So we're in the
9  process of trying to identify those girls as well.
10          THE COURT:  Now, you say they were in files?
11          THE WITNESS:  In files on the computer.
12          THE COURT:  In files on the computer.  So the
13  defendant had individual girls in different files --
14          THE WITNESS:  Yes.
15          THE COURT:  -- with multiple pictures of each one?
16          THE WITNESS:  Yes, sir.
17          THE COURT:  Okay.
18  BY MS. BAY:
19  Q       And so--  I don't want to put words in your mouth.
20  So tell me if I'm wrong.  So is it your belief, based on how
21  this was set up and the GPS of this one individual and the
22  type -- the pictures themselves, that these pictures were sent
23  directly from the victim to this defendant, or that he
24  received -- he downloaded these from the Internet the way most
25  child pornographers receive theirs?

```
 1  A         Based on the fact that we have one individual who

 2  has already filed a complaint and the fact that we have

 3  another individual that we now have identified in Kansas, it

 4  is our belief that these other -- it is a very strong

 5  possibility these other girls are also -- could possibly also

 6  be victims that we do not know about or have not been

 7  identified as of yet.

 8  Q         And, lastly, aside from child pornography, have you

 9  received any information that would be helpful to the Court

10  regarding this defendant?

11  A         In dealing with the Rhea County Sheriff's Office --

12  we had several meetings with them, and I had a meeting with

13  the detective division.  What they told me was that over

14  time -- and I didn't get a specific time, but over time they

15  have received numerous complaints about the defendant,

16  complaints not only from -- from the Dayton or Rhea County

17  area, but even complaints from outside the state.  For

18  example, they said they've --

19            MR. BERGMANN:  Judge, may it please the Court, I

20  understand that this is -- this hearing is not subject to

21  hearsay, hearsay can be brought in.  That's double hearsay, and

22  we don't -- there's no indicia of reliability of the second

23  hearsay component.  So I would object to it for that reason.

24            THE COURT:  All right.  The government's position?

25  BY MS. BAY:
```

```
 1   Q        Well, let me ask a generalized question about the
 2   nature of these complaints, as opposed to you saying what one
 3   person said another person had said.  Okay?  So what was the
 4   general nature of these complaints, both within Dayton and
 5   Rhea County and outside of it?
 6   A        Outside of Rhea County the complaints were of
 7   threats made by the defendant.  Inside Rhea County it was
 8   complaints of the defendant hanging around parks and schools
 9   while the kids were there.
10   Q        And what type -- what -- threats of physical
11   violence, or --
12   A        Threats of physical violence, yes.
13            MS. BAY:  I'll pass the witness.
14            THE COURT:  You may cross-examine.
15            MR. BERGMANN:  Thank you, Your Honor.
16                          CROSS-EXAMINATION
17   BY MR. BERGMANN:
18   Q        My client's never been arrested for anything that
19   you know -- I'm sorry, never been convicted of anything that
20   you know, right?
21   A        That's correct, yes, sir.
22   Q        Okay.  So -- and there's no evidence that he's ever
23   physically assaulted anybody; there's no conviction for that.
24   Is that correct?
25   A        That's correct, yes, sir.
```

Case 1:14-cr-00109-TRM-CHS   Document 36   Filed 08/05/15   Page 23 of 44   PageID #: 286

1  Q          All right.  Is it possible that on some of these

2  alleged contacts somebody else could have contacted my client?

3  A          That's very possible, yes.

4  Q          For instance, the girl in Kansas that you mentioned,

5  is it possible that she could have contacted him?

6  A          Yes, sir, that's possible.

7  Q          All right.  You say that a search warrant was

8  executed in -- sometime in January of this year, right?

9  A          Yes, sir.

10  Q          All right.  The state did not pick this up per se,

11  they did not charge my client with any wrongdoing.  Is that

12  correct?

13  A          Not that I'm aware of, no, sir.

14  Q          All right.  So at that time, at the time that any of

15  these things allegedly occurred after that search was

16  conducted at my client's residence, no prosecution was

17  forthcoming until Friday.  Is that correct?  So my client

18  wasn't under conditions of bond, pretrial release, or anything

19  else.  Is that correct?

20  A          That's correct, yes, sir.

21  Q          All right.  Have you been to the house yourself?

22  A          I have.

23  Q          All right.  And you're aware that his mother is

24  suffering from cancer and his father -- his stepfather had

25  cancer.  I think it's in remission now.

1    A          Yes, sir.

2    Q          All right.  And they're here today?

3    A          Yes, sir.

4    Q          You have no reason to believe that they would not

5    comply with the conditions placed upon them, in other words,

6    removal of computers, cutting off access to cell phones,

7    anything that would allow my client to get on the Internet or

8    contact anybody on a computer.  Is that correct?

9    A          Yes, sir, I agree with that.

10   Q          Okay.  When we talked about the CDs and DVDs that

11   were seized from the house, you haven't had a chance to go

12   through all those DVDs or CDs, have you?

13   A          I've gone through -- I don't know exactly -- I've

14   got it back in the office, but I've gone through hundreds of

15   them, I just don't know exactly how many.

16   Q          Some of them have family pictures on them, like

17   family vacations, Christmas, or whatever.

18   A          Yes, sir, that's correct.

19   Q          When you say hundreds of them have been seized, it's

20   not like hundreds of them contain child pornography; some of

21   them actually contain family albums --

22   A          Correct.

23   Q          -- Christmas, holidays, and vacations, do they not?

24   A          Yes, sir, that's correct.

25   Q          And you also -- made some comment about if a person

October 15, 2014   Barker - Examination by The Court

1   says he has those images, chances are he has those images?

2   A        It's been my experience in dealing with these cases

3   that people trade these images on a regular basis.  So, for

4   example, if someone offers to trade images of child

5   pornography, it's been my -- it's been my experience that they

6   have those images to trade.

7   Q        I think the words you used were "chances are."  Is

8   that right?

9   A        I don't remember exactly what I used, but if that's

10   what I said, then -- "chances," if that's what I said, but my

11   opinion is that they would have them.

12   Q        My client has been cooperative with you.  Have you

13   talked to my client?

14   A        I have not interviewed him, no, sir.

15   Q        But it's your information, is it not, that my client

16   has been cooperative with law enforcement?

17   A        Yes, sir.

18   Q        He didn't try to fight them.  He didn't put up a --

19   you know, he wasn't guilty of any kind of disorderly conduct

20   or anything like that when contacted by the authorities?

21   A        No, sir, not -- no.

22   Q        He hasn't tried to run anyplace since --

23   A        No, sir.  No, sir, not that I'm aware of.

24            MR. BERGMANN:  Okay.  One moment.

25            (Off-the-record discussion.)

 1              MR. BERGMANN:  Your Honor, I have no further

 2    questions?

 3              THE COURT:  Any further redirect?

 4              MS. BAY:  No, Your Honor.

 5              THE COURT:  All right.  Now, let me make certain that

 6    I'm understanding something.  There were -- there was a search

 7    warrant that was executed, and all these images were taken and

 8    sent to the National Center for Exploited Children.  After that

 9    event in January of 2014, there are two different events that

10    happened; one of them is, there is some e-mail being sent to

11    someone about an 18-year-old girl having a relationship with

12    her younger brother that came from his -- the IP address of his

13    home.  Is that correct?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  And then there was, later in September, a

16    cyber tip, a person saying that they were a teacher having sex

17    with some of the children, and that all of that came from the

18    IP address of this defendant's home.  Is that correct?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  All right.  And when it was checked, it

21    came back to Jerry Cheeks, Jerry Cheeks at 252 Cheeks Lane, and

22    that is the house number where this defendant lives?

23              THE WITNESS:  Yes, sir, that's correct.

24              THE COURT:  All right.  Any further cross-examination

25    of either party?

Case 1:14-cr-00109-TRM-CHS  Document 36  Filed 08/05/15  Page 27 of 44  PageID #: 290

1          MS. BAY:  Just one, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MS. BAY:

4     Q          When you went to arrest the defendant here in the

5     last week or two, did he admit, or deny, these -- possessing

6     this child pornography?

7     A          He said that he was a changed man, that he had

8     changed his life around, he had been going to church, and that

9     he was doing the right thing now, is -- I think is the term --

10    is the words he used.

11    Q          Did he claim that his father-in-law or some other

12    person at the residence was -- was a -- was doing this stuff

13    online?

14    A          I did not hear that.

15         MS. BAY:  Okay.

16                    RECROSS-EXAMINATION

17    BY MR. BERGMANN:

18    Q          Did you -- just as a matter of course, did you read

19    him his *Miranda* rights?

20    A          I did not question him.  He just -- he was blurting

21    that out as we were -- as we were walking him to the car.

22    Q          Okay.  So there's no waiver of *Miranda* rights,

23    there's no--  Did you record his statement?

24    A          I didn't take a statement from him.  He was -- as we

25    were taking him to the car, he was crying and just making

1  statements as he was walking to the car.  I did not question

2  him at all, so therefore I didn't Mirandize him.

3  Q          Okay.  Did you-- But he wasn't free to go, was he,

4  at that point?

5  A          No, sir.

6  Q          He was under arrest.

7  A          He was in handcuffs, correct.

8  Q          Did you reduce his statement to writing later on?

9  A          I did.

10  Q          And do you have that --

11  A          I do.

12  Q          -- available?

13  A          I do.

14  Q          And there are other people who live at that

15  residence.  Is that correct?

16  A          There were --

17  Q          On Cheeks Lane?

18  A          As I recall, when we arrested him there were three

19  other people there, yes.

20  Q          So -- but other people do live there?

21  A          As far as I know, yes.

22  Q          With access to those computers, right?

23  A          I would assume so.  I don't know exactly, but I

24  would assume so.

25  Q          And one of those computers -- one of those, I guess,

1    searches came back to Jerry Cheeks.  Is that right?

2    A         The IP addresses?

3    Q         Yes.

4    A         Yes.

5    Q         And it's also possible, if you have somebody else's

6    e-mail address, that you can actually -- with the same IP

7    address, you can actually, even though you're not the person

8    to whom that's registered, you can actually get online and use

9    the IP -- of course that's the IP address, but also the e-mail

10   address.  Is that correct?

11   A         I'm not sure I understand your --

12   Q         Well, I'm just saying, if you -- if I've got your

13   password, I've got your e-mail address and I've got your

14   password, I can use that?

15   A         Oh, yes, sure.

16   Q         Anybody can use it?

17   A         Sure.

18             MR. BERGMANN:  No further questions.

19             MS. BAY:  I'm sorry, Your Honor.  I just have one

20   question for clarification.  I apologize.

21                    FURTHER REDIRECT EXAMINATION

22   BY MS. BAY:

23   Q         So let me ask you this:  The IP address that comes

24   back to Jerry Cheeks, was that the person whose Internet

25   access -- whose Internet service that was in?

```
 1    A        That's correct.  That's who was paying for the

 2    service.

 3    Q        Okay.  So it's not like an individual IP for each

 4    person in the house?

 5    A        No.  No, ma'am.

 6             MS. BAY:  Okay.

 7             THE COURT:  I think that's all.  You may step down.

 8             THE WITNESS:  Thank you, sir.

 9             (Witness excused.)

10             THE COURT:  Next witness.

11             MS. BAY:  We call Candace Lindsey.

12             (Brief pause.)

13                         CANDACE LINDSEY,

14    called as a witness at the instance of the government,

15    having been first duly sworn, was examined, and testified as

16    follows:

17                        DIRECT EXAMINATION

18    BY MS. BAY:

19    Q        Will you state your name for the record, please?

20    A        Candace Lindsey.

21    Q        Where do you work?

22    A        U. S. Probation.

23    Q        How long have you been with the U. S. Probation?

24    A        Three years.  Three and a half years.

25    Q        And how long have you been in the probation
```

Case 1:14-cr-00109-TRM-CHS  Document 36  Filed 08/05/15  Page 31 of 44  PageID #: 294

```
 1    business?

 2    A         Nine years.

 3    Q         Are part of your duties here at the U. S. Probation

 4    to prepare pretrial services reports?

 5    A         Yes.

 6    Q         And as part of those reports is there a

 7    recommendation of the pretrial office regarding detention or

 8    release?

 9    A         Yes, it is.

10    Q         And also an assessment of danger?

11    A         Yes.

12    Q         As well as an assessment of nonappearance?

13    A         Exactly.

14    Q         And did you prepare the report for Mr. Krzeczowski?

15    A         Yes.

16    Q         Now, having heard what you did today from Special

17    Agent Barker, does that change anything as far as the

18    assessment of danger or assessment of nonappearance or the

19    recommendation?

20    A         It does.  Initially we recommended that the

21    defendant be temporarily detained in lieu of us doing a home

22    evaluation.  After listening to the testimony from the agent

23    that was conducting the investigation on the defendant and

24    hearing that the defendant continued to engage in these acts

25    even after having a search warrant performed at his residence,
```

1    the probation office would like to change their recommendation

2    to detention.

3              MS. BAY:  I have nothing else, Your Honor.

4              THE COURT:  You may cross-examine.

5              MR. BERGMANN:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. BERGMANN:

8    Q         That's even though -- that's all based on hearsay,

9    right?

10   A         Based on the information that the agent provided.

11   Q         Right, but which is hearsay.  So based on hearsay

12   information, you're -- you're changing your mind.  Is that

13   what you're saying?

14   A         Well, it didn't sound like hearsay to me,

15   necessarily.  It sounded like he had a forensic evaluation

16   done, that they were able to link the information found back

17   to the defendant.  I'm not sure if that's hearsay.

18   Q         Okay.  What if the computers were removed from the

19   residence, all access on iPhones and otherwise -- all access

20   to Internet was cut off, and he was monitored with, say,

21   electronic equipment or whatever to prevent him from leaving

22   the house?  Would your recommendation then change back to the

23   way it was before?

24   A         No.

25   Q         Would that not make him -- I mean, if he doesn't

1    have access to computers, if he doesn't have access to the

2    Internet, then he can't contact anybody.  If he's monitored,

3    if he's got an electronic monitoring device and he can't get

4    beyond his porch, then he can't make contact with any of these

5    alleged victims, can he?

6    A          In my opinion, one of the best predictors of future

7    behavior is past behavior.  So I'm not sure if the defendant

8    was actually leaving his residence to engage in -- in looking

9    at child pornography.  So the fact that we put him on

10   electronic monitoring, I don't know if that would stop him

11   from looking at child pornography.  If you're already in your

12   home and you're engaging in that conduct, putting you on

13   electronic monitoring is doing nothing but keeping you at home

14   anyway.  So I'm not sure if that would actually stop you from

15   doing that --

16   Q          Well, you missed the first part of my --

17   A          Okay.

18   Q          -- statement, and that was that if he had no access

19   to the Internet, okay, if -- and you're aware the fact his

20   mother has cancer, is that correct, and that she is -- she's

21   home?

22   A          She did mention that to me when I spoke to her

23   earlier, yes.

24   Q          All right.  And she is undergoing chemo, and has to

25   be home all the time, and so is able to monitor his

1    activities, whatever conditions that the Judge sets forth,

2    monitor those conditions.  Would that not provide a reasonable

3    assurance that he's not a danger to society?  Now, he's not a

4    risk to flee, is he, because he has no place to go, right?

5    His wife's here.  His family's here.  So he has ties to the

6    community.  Is that correct?

7    A          Right.  He does have ties to the community --

8    Q          Right.  And his past, he has no criminal past,

9    right?  I mean, you checked, and -- the database, the NCIC --

10   A          Right.

11   Q          -- and he does not have a conviction?

12   A          We were not able to find anything criminally related

13   to the defendant.

14   Q          Right.  So he's not -- in that regard, he's not a

15   danger to society, based on any kind of prior conduct, because

16   he's never been convicted of anything, right?  And he's 41

17   years old.  Is that correct?

18   A          I'm not sure of his exact age.  Yes, I think -- yes,

19   he is 41, uh-huh.

20   Q          All right.  So in 41 years he's never been convicted

21   of anything.  He could stay home with his parents, who have

22   promised that they'll take all the computers out of the house

23   or disconnect them or whatever, password-protect any computers

24   that are allowed to remain in the house, remove their cell

25   phones or Internet access from the cell phones.  Would that

1    not protect society?

2    A          I'm not really sure that that would protect anybody.

3    I mean, if he's willing to, based on what the agents say,

4    engage in this activity, even after having a search warrant

5    performed at his residence, knowing that authorities are

6    looking at your activities, if he's still willing to engage in

7    that type of behavior, who's to say that he's not still

8    willing to go above and beyond to engage in that same type of

9    behavior, even when placed on electronic monitoring, or even

10   when computers are taken outside of his home?  That doesn't

11   stop other people from bringing stuff to him, or, I mean, we

12   wouldn't necessarily make him stay in his residence all day

13   every day.  So if he is allowed to go outside of his

14   residence, who's to say that he wouldn't find a way to engage

15   in that type of behavior even though?

16   Q          What if you do confine him to his residence?  And I

17   think the statement earlier was made that you have no reason

18   to believe that his parents, his stepfather and his mother,

19   aren't going to do what they're expected to do --

20   A          Uh-huh.

21   Q          -- if he gets to come home?

22   A          Right.  That's their end, though.  I'm not saying

23   that they would violate any laws.  I think that they would do

24   what we're asking them to do.  We're talking about him and his

25   behavior.

1   Q       Which would do away with his access to any Internet

2   connections, right, especially if he -- especially if he's

3   confined to the home on electronic monitoring, he has no

4   computers, he has no access to computers.  These people aren't

5   going to let him get on the cell phones and access the

6   Internet.  He's at home.  He's not a danger to anybody.  He

7   doesn't have a history of criminal convictions.

8   A       He doesn't.

9   Q       Right.  So the combination -- the combination of

10  conditions about which we're speaking would protect society,

11  would it not?  And, also, he's not a risk to flee, because the

12  only family that I know of that he's got or that he's been in

13  recent contact with is his family that's sitting here in the

14  courtroom.  He's not going to leave his mother, who is, I

15  guess --

16          MS. BAY:  Your Honor, I don't know if this is a

17  proffer of information or --

18          THE COURT:  It's final argument.

19          Are you going to get to a question, Mr. Bergmann?

20          MR. BERGMANN:  Well, okay, the question --

21          THE COURT:  I don't believe the witness is going to

22  change her mind, based on what I've heard so far.

23  BY MR. BERGMANN:

24  Q       Do you agree with that?

25  A       Which question?  Sounded like a bunch of them.

Case 1:14-cr-00109-TRM-CHS   Document 36   Filed 08/05/15   Page 37 of 44   PageID #: 300

 1    Q       All of them.  Would that not assure his appearance

 2    in court, and would that not protect society?

 3    A       I don't think that he would be a risk of flight,

 4    necessarily.  There are factors that would suggest that.

 5    But -- just from my assessment, I don't necessarily believe he

 6    would be a risk of flight, but the danger to the community,

 7    based on the information that was provided today, does make me

 8    feel like he would be a danger to the community.  Like I said

 9    before, if he's been -- if he's under investigation --

10    obviously if they conduct a search warrant, they're

11    investigating you, and he's still engaging in that type of

12    behavior, I don't think there's conditions that we can place

13    on someone that would stop them from doing something that

14    they're willing to do even knowing that they're being

15    investigated.

16            MR. BERGMANN:  No further questions, Your Honor.

17    Thank you.

18            THE COURT:  You may step down.

19            (Witness excused.)

20            MS. BAY:  We have no further witnesses, Your Honor.

21            THE COURT:  All right.  Is there going to be proof

22    for the defendant?

23            MR. BERGMANN:  No, Your Honor.  I'll make a proffer.

24            THE COURT:  All right.  Proffer for the defendant.

25            MR. BERGMANN:  Thank you, Your Honor.  And I think

we've already -- I've already gotten into this to a large
extent.  His family's here.  His pastor's here.  He's got a
friend here.  His wife's here, part of the family obviously.
His wife, mother, stepfather, pastor, and a friend, they are
all supportive of him.  They are -- they will do whatever Your
Honor requests of them.  They will remove the computers from
the house.  They will not only limit but they'll do away with
Internet access.

His mother needs him, quite frankly.  She's in her
second round of cancer treatments.  This is not the first time
she's had it.  The stepfather has had cancer in the past, and
he's in remission.

His wife is here.  She is supportive of him.

And we've had a conference -- we've had several
conferences, but one lengthy conference in person.  If Your
Honor sets parameters, if Your Honor establishes conditions by
which my client has to abide, no computers in the house, do
away with the cell phones, whatever, and if these people abide
by those conditions -- and they will.  I think the other side
said, you know, "We have no reason to doubt that."  Then he's
not a danger to society, because he doesn't have access, he
can't get to the computer or the cell phone, he can't access
the Internet.

He certainly is not a risk to flee.  His family is
here.  He has no place to go.  His wife's here.  His mother's

here.  He's not going to leave her in her condition.  His
stepfather's here.  And his church is here.  His pastor is
here.  And he was willing to come down, and he is here today.

Your Honor, the government has the proof -- has the
burden of proof by clear and convincing evidence that there
are no -- there is no combination of conditions that will
suffice to protect society and to assure his -- negate his
assurance of appearance in court.  We submit that there are --
the conditions that we've talked about are conditions that
will assure his appearance in court, and that will protect the
safety of the community.

He doesn't have a prior record.  He's not a violent
offender.  This is the first time he's been in -- certainly in
federal court.  And like I said, he has not been convicted.
History and characteristics, he's got family ties, he's got
community ties, he's lived here --

How long have you lived here?

THE DEFENDANT:  Since 1989.

MR. BERGMANN:  -- since 1989, so many, many years.
He's not going anyplace.

Past conduct, no record, no criminal history.  Your
Honor, he is a prime candidate to go home with whatever
conditions Your Honor imposes——home confinement, ankle
bracelet, electronic monitoring device.  That's the same
thing, obviously.  But we submit that he is a candidate to go

1    home.

2            It's my understanding he's received some death

3    threats at Silverdale, and I'm concerned about him for that

4    reason.  I think his family is concerned.  I know he's

5    concerned.  So if Your Honor lets him go home, he's not going

6    anyplace other than my office and the probation office.  So we

7    think that he is a prime candidate to go home, and we would

8    ask Your Honor to release him on whatever conditions Your

9    Honor deems applicable in this case.

10           THE COURT:  Thank you, Mr. Bergmann.

11           MR. BERGMANN:  Yes, sir.

12           THE COURT:  All right.  I'll hear argument, the

13   government first.

14           MS. BAY:  Your Honor, I would say that the defendant

15   has not overcome the rebuttable presumption in this case.  I

16   know Mr. Bergmann has said that the defendant would not leave

17   his house, ever, except for visits to his lawyer, visits to his

18   probation officer.  I assume visits to the church would also be

19   there, visits to doctors.  It's very easy -- every public

20   library in the state has a computer with Internet access on

21   there, every -- just about every smartphone, I mean, you know,

22   it's -- I don't know that the people behind us would -- behind

23   me would bring the defendant a smartphone, but there are plenty

24   of other people in the community who might.  And I think that

25   the defendant's use of other identities and, you know, reaching

out to these individuals also indicates his manipulativeness.

And I believe that there is still a danger to the community,

and that no conditions or combination of conditions would

prevent that. I ask that he be detained.

THE COURT: Thank you.

Mr. Bergmann?

MR. BERGMANN: Your Honor, I did it again. I made my

argument at the tail end of my argument. So I apologize.

THE COURT: I understand. It's not -- it's not

always possible to resist that.

All right. The Court has the question of release or

detention for Mr. Krzeczowski. The indictment in this case

charges various forms of child pornography, production of it

in Count 1, receipt and distribution and another possession of

it in Count 4. Because of the nature of this charge, the

Congress has determined that there is a rebuttable presumption

that exists that he is both a risk of flight and danger to the

community. The allegation is that he has been using, at a

minimum, child pornography. And it's difficult to understand

why that's become such a problem in our country, but it is.

He is presumed innocent, of course, of that charge, but

nonetheless he is charged with it. And the charge itself

brings that rebuttable presumption to the Court's attention.

Now, the difficulty Mr. Krzeczowski has-- And he

has a family, he's got a pastor here, and that is wonderful

1   that he has all this support.  But the things that I can't get

2   around in this are the fact that after the search warrant was

3   executed, there are two examples of what appears to be

4   Mr. Krzeczowski using the computer to continue his conduct.

5   And I do not think, when that set of facts is considered,

6   there is any way he can rebut that presumption; I just do not.

7   I mean, he has -- he has good support, and he does not have a

8   prior record, but I conclude that he has continued to do this,

9   that he is being -- that he is using, you know, false names,

10  making things up, I don't know why, but it looks to me like

11  the evidence in the case supports that.  So I will order his

12  detention based upon a danger.  I conclude he has not rebutted

13  it.

14          I'm sorry for the family, but these are serious

15  charges, and the law that I have to abide by is -- provides

16  for that rebuttable presumption, and I do not find that he has

17  rebutted it.

18          Anything further for the government?

19          MS. BAY:  No, Your Honor.

20          THE COURT:  Anything further, Mr. Bergmann?

21          MR. BERGMANN:  No, thank you, Your Honor.

22          THE COURT:  Let this hearing be adjourned.

23                      END OF PROCEEDINGS

24

25

1          I, Elizabeth B. Coffey, do hereby certify that I

2    reported in machine shorthand the proceedings in the

3    above-styled cause, and that this transcript is an accurate

4    record of said proceedings.

5

6

7                                   s/Elizabeth B. Coffey
                                     Elizabeth B. Coffey,
8                                    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25